Charlotte Dickens et al., Respondents, *v.* Robert Miller, Appellant.

### June 20, 1882.

1. A scroll must, in order to give it the effect of a seal, be referred to as a seal in the body of the instrument.

2. It will not be presumed that the word "seal" used in a certified copy is meant to indicate the existence of the impression of a seal on the original.

3. That a person has not been heard from for some years does not establish his death, in the absence of proof that he had left the state.

Appeal from the St. Louis County Circuit Court, Edwards, J.

*Reversed and remanded.*

Franklin Ferriss and Mortimer F. Taylor, for the appellant.

A. McElhinney, for the respondents.

Thompson, J., delivered the opinion of the court.

This is an action of ejectment. It appears that the land was granted in 1857 by the United States to Rebecca Hooper, who, in 1867, conveyed it to George W. Dickens. The plaintiffs, except Mr. McElhinney, claim title to the land as the heirs at law of George W. Dickens, and Mr. McElhinney claims title as grantee of these heirs. The defendant does not exhibit any title. He claims to have entered as tenant of George W. Dickens, and that when Dickens left the neighborhood, as hereafter stated, he simply claimed the land as his own, and repudiated the tenancy.

The defendant offered in evidence a certified copy of a deed from Rebecca Hooper to Dempson Hooper, to show an outstanding title. This deed contains no testimonium clause, and nowhere on its face does it purport to be a sealed instrument. After the signature of the grantor, which

is written with a mark, is written the word "seal," partially enclosed in a circle or flourish. This deed was rejected on the ground that it did not purport to be sealed ; and this is complained of as error. Our statute which permits the use of a scroll by way of seal, is as follows : "Every instrument of writing expressed on the face thereof to be sealed, and to which the person executing the same shall affix a scrawl by way of seal, shall be deemed and adjudged to be sealed." Rev. Stats., sect. 662.

This statute was in force in 1848, when the deed in question purports to have been made. Rev. Stats. 1845, p. 216, sect. 5.

It is conceded that under this statute, where a scroll is used upon a deed instead of a seal, the scroll must be referred to as the grantor's seal, somewhere in the deed, either in the body of it, or in the testimonium clause. In other words, if the person executing the deed uses a scroll instead of a seal, he must say in the deed that it is his seal, or it will be no deed. *Cartmill* v. *Hopkins*, 2 Mo. 220 ; *Grimsley* v. *Riley*, 5 Mo. 280 ; *Walker* v. *Keile*, 8 Mo. 301 ; *Glasscock* v. *Glasscock*, 8 Mo. 577. On the other hand, when the deed is in fact sealed, it is unnecessary to mention the fact, either in the body of the deed or in the testimonium clause. *Dingee* v. *Kearney*, 2 Mo. App. 515, 525.

But in the present case the court below did not have before it the deed itself, but only a copy of it, certified from the public records by the recorder. Had the deed been, in fact, impressed with a waxen seal, this seal could not have been copied, either in recording it, or in making the transcript from the record. This being so, the defendant claims that we ought to presume that the deed was in fact sealed when it was executed. It is true that a presumption of right acting is frequently resorted to in courts of justice, to supply deficiencies in a chain of title after a lapse of time. *Ex diuturnitate temporis omnia præsumuntur rite et*

*solemniter esse acta.* But as pointed out by Bakewell, J., in
*Dingee* v. *Kearney* (2 Mo. App. 515, 525), this is an arti-
ficial presumption founded in public policy, and resorted to
for the purpose of supporting titles which have been accom-
panied by long-established possession under a claim of
absolute ownership, It will not be resorted to, against the
probability as to the fact, for the purpose of establishing
an outstanding title, so as to enable a defendant in eject-
ment to prevent a recovery without showing any title in
himself. Such a presumption in this case would be against
the strongest probability as to the fact. We may take
judicial notice of the fact that the use of private seals has
never been in vogue in this state. If there have been ex-
ceptions to this rule, they have been extremely rare. That
a woman who could not write her name should have such
a seal would, in our day, be in the last degree improbable ;
though the inability of a person to write in ancient times,
afforded the chief reason for his having a seal.

There is scarcely the most attenuated probability that
the original of the deed in question was ever impressed with
a seal of wax, or of any other adhesive substance, by or
for Rebecca Hooper. ·If the scroll made on the copy
of the deed in this case stood in place of the seal of
a notary public or other officer, who, in authenticating
such instruments is required to use a seal, the presumption
would be entirely different, for the probability would be ex-
actly the reverse ; and therefore the case of *Dale* v. *Wright*
(57 Mo. 110), which so holds, does not help the defend-
ant. *Boynton* v. *Reynolds* (3 Mo. 79), is not an authority
for the defendant's position, as will appear from the ex-
planation of it given in *Walker* v. *Keile* (8 Mo. 301). In
the former case, an instrument was declared on as a
" sealed note." The clerk could not make it appear in
copying it in the transcript, whether or not it was sealed,
and the supreme court presumed, in support of the judg-
ment of the circuit court that it was sealed. It was

probably filed with the declaration under the statute. If it had not been, the defendant could have craved oyer and demurred, thus bringing to the attention of the circuit court the question whether or not it was a sealed instrument. Private seals have long ceased to be of any value in the authentication of written instruments, and the rule which preserves the distinction between sealed and unsealed instruments, where so executed, is entirely technical and formal. But it is interwoven with our law of real property, and preserved in our statute law. We cannot, therefore, disregard it, and we must accordingly hold that the learned judge committed no error in refusing to admit this so-called deed in evidence.

2. There was, no direct evidence that George W. Dickens was dead. There was evidence to the effect that, in 1868 or 1869, he had lived on the place for a year or so, and that he then went away to Pulaski County in this state, where he lived some months with his brother Thomas, working during the time on the railroad as a laborer. In March, 1870, he left his brother's house in Pulaski County for the purpose, as he stated, of going to Lebanon, in this state, to get his pay from the railroad company. A month later he was known to be in Lebanon. Since then his family, according to the testimony of his brothers, have never seen nor heard of him. When he left St. Louis County he was about twenty-two years old and unmarried. He had been living by himself on the place in controversy. A peddler had taken sick and died there, and Dickens said he thought the house was haunted. When he expressed his intention of going away he was advised against it, but he said he had no one to work for, and he would let everything go to the devil. He appointed a friend to take charge of his personal effects and settle his debts. The circumstances of his departure, disclosed in the evidence, seem to indicate a purpose on his part never to return. There was evidence tending to show that members of his family had been heard

to say that he had been heard from within seven years prior to the bringing of the suit. The plaintiffs rest their right to recover the land upon the presumption that George W. Dickens is dead. As appropriate to the evidence tending to raise this presumption, the learned judge gave, of his own motion, the following instruction: "To entitle the plaintiffs to maintain this action, it must be proven that George W. Dickens was dead at its commencement. But this fact is not required to be shown by direct and positive proof. It may be established by absence in connection with such facts and circumstances as satisfy the jury that George W. Dickens was dead when the suit was filed. Or such fact may be shown by the legal presumption arising from a continued absence of seven years, without being heard from during that time. And if the jurors believe and find from the evidence that George W. Dickens has been absent from his home or usual place of residence for a continuous period of seven years prior to the commencement of the suit, and that he has not been heard from by his family relations or members during that time, then the legal presumption of death has been established, and this presumption can only be overthrown by proving that George W. Dickens was alive during that seven years, or that he is alive now."

He also refused, among others, the following instruction offered by the defendant: "The court instructs the jury that the death of George W. Dickens is a fact that must be proved by the plaintiffs before they will be entitled to recover in this case; and, though proof of seven years' absence without being heard from raises a presumption of death, yet such presumption is *prima facie* only, and, in passing upon the question of death, the jury may consider in connection with this presumption all the circumstances in evidence attending the departure of said Dickens and his absence; and although the jury may believe from the evidence that George W. Dickens departed from his usual

place of abode more than seven years before this suit was filed, and has not been heard from since, yet, unless the jury is satisfied from this fact, taken in connection with all the facts and circumstances attending such absence, that George W. Dickens was dead when this suit was brought, then the verdict will be for defendant."

This presumption is not an absolute one. It is open to be rebutted by proof or by counter-presumptions. 2 Whart. on Ev., sect. 1274. It is frequently called a presumption of law. *Ibid.;* Abb. Tr. Ev. 75. Mr. Best challenges this denifition, and calls it a mixed presumption, meaning, we suppose, a mixed presumption of law and fact. 2 Best on Ev., sect. 409. And this is the more correct view of it. *Donaldson* v. *Lewis,* 7 Mo. App. 403, 407. It seems to be a presumption of law in this sense, that the law authorizes the triers of fact to infer from seven years' unexplained absence abroad, that the person thus absenting himself is dead. But they are not bound so to infer. The circumstances attending the absence may be such as to make the presumption unreasonable ; it may be strengthened or impaired by the attending circumstances. Abb. Tr. Ev. 76. In short, this presumption is, as Dr. Wharton has justly observed, when not governed by statute, a presumption of logic varying with the circumstances of particular cases.

Such being the common-law rule, let us see how it stands in the statute law of this state. We have the following statute : " If any person who shall have resided in this state go from and do not return to this state for seven successive years, he shall be presumed to be dead in any case wherein his death shall come in question, unless proof be made that he was alive within that time." Rev. Stats., sect. 2330. The case before us is not within this statute, for there is no evidence tending to prove that George W. Dickens ever left this state. On the contrary, he was last heard from at Lebanon in this state. If the instruction given by the learned judge can be upheld, it must be upon the com-

mon law, and not upon the statutory rule. It may be argued that the statute was intended to define the common-law rule, and that there is in this state no rule upon the subject outside of the statutory rule. This we apprehend is only true so far as the statutory rule extends. Death may be presumed from an unexplained absence for a shorter period than seven years, if the circumstances attending the absence were such as to make the duration of life improbable. *Lancaster* v. *Washington Life Ins. Co.*, 62 Mo. 121; *Hancock* v. *American Life Ins. Co.*, 62 Mo. 26, 31.

For similar reasons, it is obvious that the presumption may arise from an unexplained absence of seven years or more, although the person, when last heard from, was within this state.

Applying these rules to the case before us, we think that, in a case not within the terms of the above statute, the jury cannot be told that the fact of death is established by the absence of the person from his usual place of abode for seven years, during which time he has not been heard from by his family or relations, unless it is shown that he was living during that time or at the present time. Such an instruction, it seems to us takes the question from the jury, and requires them to find from the fact of the unexplained absence that the person was dead. The instruction given by the learned judge of his own motion did not, it is true, tell the jury in so many words, that the fact of the death of George W. Dickens was established by the unexplained absence, but it told them that if they should find such facts, "then the legal presumption of death has been established." It is obvious that the jury would understand this to mean that if they should believe certain facts relating to the absence of George W. Dickens, then they must necessarily find that he was, in fact, dead, unless it was shown that he was living during the seven years, or that he was living at the time of the trial. This, it

seems to us, erroneously took the case from the jury. On the other hand, the third instruction offered by the defendant and refused, was, it seems to us, a correct exposition of the law upon the point, as applicable to the facts of this case, and we think it should have been given.

For the error in refusing the defendant's third instruction, and in the giving of the instruction which the court gave of its own motion, we feel constrained to reverse the judgment and remand the cause. · It is so ordered. All the judges concur.